IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.  25-cr-311-GPG

UNITED STATES OF AMERICA,

        Plaintiff,

v.

DAVID JOYNER,

        Defendant.

---

## INFORMATION

---

The United States Attorney charges:

### COUNT 1
### (18 U.S.C. § 371)

At all times relevant to this Information:

**The Medicare Program**

1.      The Medicare Program ("Medicare") was a federally funded program that provided free and below-cost health care benefits to individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare & Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Medicare covered different types of benefits and was separated into different program parts. Medicare Part B covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4.      Medicare providers included independent clinical laboratories, physicians, and other health care providers who provided items and services to Medicare beneficiaries. To submit claims for reimbursement to Medicare, a provider was required to submit a Medicare Enrollment Application Form. The application contained certifications that the provider was required to make before the provider could enroll. Specifically, the application required the provider to certify, among other things, that the provider would abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and that the provider would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

5.      A Medicare provider number was assigned to a provider upon approval of the provider's application. A health care provider who received a Medicare provider number was able to submit claims with Medicare to obtain reimbursement for services provided to beneficiaries.

6.      A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number; (b) the billing codes for the benefit, item, or service provided or supplied to the beneficiary (referred to as Current Procedural Terminology, or CPT, codes); (c) diagnosis codes (referred to as ICD-10 codes); (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; (e) the name of the referring physician or other health care provider; and (f) the referring provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI").

7.      When submitting claims to Medicare for reimbursement, providers were required to certify that: (1) the contents of the forms were true, correct, and complete; (2) the forms were prepared in compliance with the laws and regulations governing Medicare; and (3) the services that were purportedly provided, as set forth in the claims, were medically necessary.

8.      Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare would not reimburse claims that were procured through the payment of kickbacks and bribes.

**Commercial Insurance Programs**

9.      Commercial health insurers, such as UnitedHealthcare, Inc., Aetna, BlueCross BlueShield, and Cigna Healthcare, reimbursed independent clinical laboratories for genetic testing under certain circumstances. Commercial health insurers were programs in and affecting interstate commerce and were health care benefit programs as defined in Title 18, United States Code, Section 220(e)(3).

**Coverage for Genetic Testing**

10.     Genetic testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of diseases in the future. There were different types of genetic testing, such as cancer genetic testing (referred to as "CGx"), cardiovascular genetic testing, pharmacogenomic testing (referred to as "PGx"), and others. Genetic testing was not a method of diagnosing whether an individual presently had a certain medical condition or disease.

11.     To complete a genetic test, the patient typically provided a cheek swab (buccal swab) containing DNA material. Tests were then run for different "panels" of genes identified by the clinical laboratory.

12.     Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § l395y(a)(l)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury." 42 C.F.R. § 411.15(a)(1). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

13.     If laboratory testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. The regulations provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is

4

treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a). "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

14.     Whether commercial health insurance plans covered genetic testing depended upon each individual plan's specific coverage rules, but all plans required that the testing be medically necessary. Commercial insurers often required the laboratories that submitted claims for genetic testing to include patient treatment notes with the claims to support the purported medical necessity for the test.

**The Defendant, Related Entities, and Relevant Persons**

15.     Defendant DAVID JOYNER owned and operated Genetic Cancer Group, Inc., which he held out as a "marketing company." JOYNER was a resident of California.

16.     Tesis Labs LLC, also known as Tesis Biosciences LLC ("Tesis"), was a limited liability company formed under the laws of Delaware in or around October 2019.

17.     As relevant to this Information, Tesis, through various entities, owned and operated two independent clinical laboratories. Alliance DX, LLC ("Alliance") was an independent clinical laboratory located in Houston, Texas, that was enrolled with Medicare and submitted claims to Medicare and certain commercial insurance programs. 303 Diagnostics LLC ("303 Diagnostics") was an independent clinical laboratory located in Aurora, Colorado, that was enrolled with Medicare and submitted claims to Medicare and certain commercial insurance programs.

18.    Adam Shorr was a beneficial owner of Tesis through an entity he controlled. He also contracted to be a "Business Consultant" for Tesis and worked with call centers and "marketing" groups that sold genetic testing referrals to the Tesis laboratories.

19.    Victor Roiter was a beneficial owner of Tesis through a limited liability company he controlled. Among other titles, Roiter was identified as a Vice President for Tesis. Roiter was also responsible for working with call centers and "marketing" groups that sold genetic testing referrals to the Tesis laboratories.

20.    Ronald King was the CEO of Tesis and a beneficial owner of Tesis through a limited liability company he controlled. King also participated in managing and directing Billing Company, which reviewed and submitted claims from the Tesis laboratories to Medicare and commercial insurers.

21.    Robert O'Sullivan was a beneficial owner of Tesis through a limited liability company in which he was a shareholder.

**The Conspiracy**

22.    Beginning in or around not later than October 2020 and continuing through in or around December 2022, in the District of Colorado and elsewhere, the defendant, DAVID JOYNER, did knowingly and voluntarily, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with owners and operators of Tesis, including Shorr, Roiter, King, and O'Sullivan, and others to commit offenses against the laws of the United States, that is:

a.    to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving any remuneration, including kickbacks and

bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal healthcare program, that is, Medicare; and

b. to violate Title 18, United States Code, Section 220(a)(1)(A), by knowingly and willfully soliciting and receiving remuneration, including any kickback, bribe, or rebate, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a laboratory, with respect to services covered by a health care benefit program in and affecting interstate commerce.

**Manner and Means**

23.     Acting interdependently, the manner and means by which JOYNER and his co-conspirators sought to accomplish the objects of the conspiracy included, among other things, the following.

24.     DAVID JOYNER used telemarketing to target and induce Medicare and commercial insurance beneficiaries to submit to medically unnecessary genetic testing. JOYNER directed telemarketers working in call centers to collect medical information from beneficiaries that would be entered on to requisition forms—the doctors' orders for the genetic tests—as "medical necessity" justification for the tests and before the physicians signed the forms. JOYNER also directed the telemarketers to pre-select on the doctors' orders the specific genetic testing panel to be run for each beneficiary induced to participate in testing, before the ordering physician received the form.

25.     JOYNER induced physicians to sign doctors' orders (also referred to as requisition forms) for these pre-selected genetic tests through a process referred to as "doctor chase." The "doctor chase" process involved JOYNER's telemarketers getting beneficiaries to identify their primary care physicians, then the telemarketers "chased" the primary care physicians to get them to sign the doctors' orders. JOYNER caused telemarketers to fax requisition forms with pre-populated diagnoses purporting to form the medical justification for the test and with the specific genetic testing panel pre-selected to the physicians. JOYNER caused the telemarketers to make false and intentionally misleading representations to the physicians to induce them to sign off on pre-populated doctors' orders his company transmitted to the doctors' offices.

26.     JOYNER solicited and received kickbacks and bribes from Tesis in exchange for recruiting and referring Medicare and commercial insurance beneficiaries, with completed doctors' orders for genetic tests, to Tesis laboratories for genetic testing, knowing that the laboratories would bill Medicare and commercial insurers for testing purportedly provided to the recruited beneficiaries.

27.     JOYNER negotiated the kickback and bribe arrangements with Tesis representatives based on the volume and value of payments expected by Medicare and commercial insurance to the laboratories for the claims associated with his referrals, and regardless of whether the genetic testing was medically necessary for the beneficiaries or compliant with the insurer's rules and regulations.

28.     The co-conspirators concealed the kickbacks and bribes through sham contracts, which falsely described the payments for purportedly legitimate "marketing and business

services" that the co-conspirators and JOYNER did not intend for JOYNER to perform and that
he did not perform. The co-conspirators referred to these contracts as "flat rate agreements,"
because the contracts called for payment of a specific amount per month that falsely purported to
be unrelated to the volume and value of referrals the marketer intended to or would sell to the
Tesis laboratories. The contracts falsely affirmed that the compensation provided for in the
agreement was the "reasonable, fair market value of the Services being provided," when in fact
the payment was based on the number of referrals the marketing company would sell to the
laboratories.

29.    JOYNER executed a sham contract between Genetic Cancer Group and Alliance
to disguise kickbacks he solicited and received for genetic testing referrals.

30.    The laboratories and Billing Company directed and trained JOYNER on the
medical information and diagnosis codes needed for each type of genetic test ordered for each
beneficiary in order for JOYNER's referrals to be "accepted" by the lab. The laboratories
required the marketing companies to submit requisition forms that contained certain diagnosis
codes (ICD-10 codes) that Billing Company had determined would "justify" each testing panel
and the billing codes (CPT codes) submitted to Medicare and commercial insurers for each
panel. The Tesis laboratories billed Medicare and commercial insurance programs for their
genetic testing panels using multiple billing codes, or CPT codes, each with its own
reimbursement rate. The laboratories only "accepted" orders that the Tesis co-conspirators
believed would provide facial justification to the insurance programs for payment for sufficient
CPT codes to maximize payment for the test.

31.    JOYNER caused the signed doctors' orders with the beneficiaries' genetic samples to be sent to the Tesis laboratories for testing. Neither the beneficiary nor the doctor who signed the genetic testing order chose which independent clinical laboratory would run the test, nor which specific test panel would be run.

32.    Because commercial insurers often required the laboratories that submitted claims for genetic testing to include patient treatment notes with the claims to support the purported medical necessity for the test, JOYNER was also directed to submit patient treatment notes with doctors' orders for genetic testing. JOYNER had his telemarketers create "S.O.A.P." notes purporting to document physicians' consultations with patients to satisfy this requirement.

33.    After the Tesis laboratory received the doctors' orders with the beneficiary referrals, Billing Company reviewed the diagnosis codes on the forms to determine if there were sufficient codes to facially justify the testing and to obtain payment. The co-conspirators referred to this process as "scrubbing." The referrals JOYNER directed to the laboratories were "accepted" or "rejected." Lists of rejected tests were sent to JOYNER. Tesis requested that JOYNER "correct" the doctors' orders by adding or changing diagnosis codes so the referrals could become "accepted," claims could be sent to health insurance programs, and the laboratories would receive payment for the claims.

34.    Shorr, Roiter, King, and other laboratory employees reviewed the number of accepted samples received from JOYNER each month to track the number of accepted referrals for which JOYNER would be paid. Ronald King approved the payment of each monthly kickback and bribe. The Tesis owners relied upon and profited from the revenue generated from

genetic testing claims for beneficiaries and physicians JOYNER referred and caused to be referred to the Tesis laboratories.

35.    In or around November 2021, JOYNER was informed that signed test requisition forms he had sold to Tesis listed the "wrong" gene panels associated with the test panels checked for the tests—that is, the form misrepresented the specific genes that the Tesis laboratories were testing as part of their panels. Tesis instructed JOYNER that these requisitions would have to be "corrected" before Tesis could accept and run the tests, and Tesis would need an "addendum" to the signed doctor's order stating that the doctor actually ordered a different genetic testing panel than the panel identified on the doctor's signed order.

36.    In or around March 2022, CMS suspended Alliance's enrollment with Medicare, and thereafter Tesis began directing certain billing for tests through its separate lab, 303 Diagnostics, located in Colorado.

37.    JOYNER and his co-conspirators caused Alliance to submit approximately $167,056.04 in false and fraudulent claims to Medicare for medically unnecessary genetic testing orders procured through the payment of kickbacks and bribes, for which Medicare paid approximately $126,661.09.

38.    JOYNER caused Alliance and 303 Diagnostics to submit claims to commercial insurers and caused the billing of an amount currently unknown to commercial insurance providers for genetic testing claims.

39.    JOYNER received payments totaling $3,679,000 in kickbacks and bribes as part of the scheme.

**Overt Acts**

40.     In furtherance of the conspiracy, and to accomplish its objectives, at least one of the co-conspirators committed, or caused to be committed, in the District of Colorado and elsewhere, at least one of the following overt acts, among others:

41.     After a telemedicine provider introduced JOYNER to Adam Shorr on August 10, 2020, and after Shorr set up a call with JOYNER, Shorr, and King regarding "Lab/Marketer relationship" for August 11, 2020, on or about October 2, 2020, JOYNER e-mailed Shorr and asked Shorr to call him as soon as possible, stating, "I'm looking to bring on a new Lab Partner and need to do so ASAP."

42.     On or about December 14, 2020, Shorr made a notation in his records indicating, "David Joyner 1600 cardiac – 1300 diabetes."

43.     On or about December 15, 2020, Shorr e-mailed JOYNER an agreement between Alliance and Genetic Cancer Group, Inc., providing for payment for "Marketing Services" to JOYNER's company of $160,000 per month.

44.     On or about December 15, 2020, JOYNER e-mailed Shorr a signed copy of the agreement between Alliance and Genetic Cancer Group, Inc. JOYNER further stated, "please send me your Req forms (PDF Fillable if possible) for both Cardiac and Diabetes in addition to all the ICD codes you guys are accepting for both tests."

45.     On or about December 15, 2020, Shorr forwarded the above e-mail to King, Roiter, and a Tesis employee located in Colorado stating that attached was "David Joyner's flat rate agreement."

46.     On or about December 21, 2020, Shorr sent JOYNER genetic testing requisition forms for diabetes and other panels.

47.     On or about December 29, 2020, Shorr sent JOYNER "fillable" requisition forms for PGX, cardiac, and cancer genetic tests.

48.     On or about January 7, 2021, Shorr forwarded JOYNER an e-mail from Roiter with the Subject, "Signed Agreement Cancer Diagnostic LLC" with the attachment "Alliance Diagnostics and Cancer Genetic Testing Group Flat Fee Agreement." The attached Marketing Business Services Agreement was dated December 15, 2020, and included a fee provision for payment of $160,000 per month for "Services".

49.     On or about January 13, 2021, JOYNER e-mailed Shorr with subject line "Reg approval – Private." Attached were: (1) a fax cover sheet from "Genetic Health Advocates" stating that "The Patient has requested a Cardiac Condition Hereditary Test Assessment," that "Contact Information for a Genetic Counselor will be available with the Assessment results . . . .", and directing the recipient to "Please sign/date the bottom of Page 1" and "initial page 3"; (2) a Diabetes Obesity Genetic Test Requisition Form with a box titled "Approved ICD 10 Codes" that stated "*ICD 10 codes approved unless changed on page 2," indicating the diagnosis codes would be pre-populated on the form sent to physicians; and (3) a Cardiovascular Disease Genetic Requisition Form containing a "Diagnostic Information box" that stated "*ICD 10 codes approved unless changed on page 3," also indicating the diagnosis codes would be pre-populated on the form sent to physicians

50.     On or about January 29, 2021, Shorr texted Roiter, "David Joyner is supposed to give us 200 a month in Texas."

51.     On or about February 2, 2021, Shorr forwarded to King, Roiter, and a Tesis employee attachments representing JOYNER's "first two patients" and stating that JOYNER wanted to be sure they were "comfortable" with the patients before sending the patients a genetic testing swab kit. Attached were two files for two patients. Each included a fax cover sheet from JOYNER to the patient's primary care physician. One, for a "Diabetes-Obesity Genetic Test Requisition Form," misleadingly represented that the fax came from "Diabetic Solutions," stated that the "patient has requested" the test, and falsely stated that contact information for a Genetic Counselor would be available with the assessment results. The fax asked the doctor to "sign/date" the bottom of Page 1 (the requisition form, or doctor's order) and listed pre-populated ICD 10 Codes derived from information collected by JOYNER's telemarketers. The second file, for a "Cardiovascular Disease" genetic test, misleadingly represented that the fax came from "Genetic Health Advocates," stated that the "patient has requested" the test, and falsely stated that contact information for a Genetic Counselor would be available with the assessment results. The fax also asked the doctor to "sign/date" the bottom of Page 1 (the requisition form, or doctor's order) and listed pre-populated ICD 10 Codes derived from information collected by JOYNER's telemarketers.

52.     On or about February 9, 2021, Roiter and King exchanged texts regarding the agreement with JOYNER. Roiter texted King, "So you ok 1500 a sample plus shipping for Adam's new group?" Roiter further specified, "David Joyner / New group / He told me he spoke with you." King stated, "I haven't signed anything with David Joyner / I told Adam to fix the agreement in draft and send to me." Roiter replied, "I signed the 1500 a week ago but now he

wants me to sign the shipping charges / I asked if you knew, he said yes / I told him [Shorr] to tell Joyner to f[#%k] off, Adam doesn't feel right doing that."

53.    On or about February 25, 2021, Shorr directed a Tesis employee located in Colorado to "assign him [JOYNER] an ID number so he can affix it to the requisition form." In response, the Tesis employee responded with an assigned code and attached a list of all sales representative codes, identifying JOYNER as #85.

54.    On or about March 15, 2021, JOYNER e-mailed Shorr a document titled "ADX invoice 3.15.21" and stated, "Please see attached invoice." The attached invoice was from Genetic Cancer Group to Alliance DX, LLC for "Marketing Services" for "Pay Period February 15th to February 28th" for a total of $80,000.

55.    On or about March 16, 2021, Shorr forwarded the invoice to King and a Tesis employee and stated, "wire info on bottom of his invoice."

56.    On or about April 30, 2021, Shorr e-mailed King "Payments for today 4/30/21" and listed "Texas / David Joyner 80k."

57.    On or about May 1, 2021, JOYNER e-mailed Shorr, Roiter, and another Tesis employee addressing JOYNER's "contract obligations," and stated that "[e]ven with the supposed rejection[s] that I had no idea about until Friday, April 30th, I'm still close to 200 samples that I have produced. I didn't get any compensation at all in February because I wanted to give Tesis a cushion of samples just in case there are any rejections. Many spreadsheets are floating around, Zoho, What Adam sent me, etc. You can see in all of them. So far, I'm very close to the 200 samples, even if I have '66 Rejections' (which could be remedied very quickly if I had a clear line of communication)."

58.    On or about May 6, 2021, JOYNER e-mailed Shorr, Roiter, and other Tesis employees and stated that for "doctor chase" physicians who did not sign the doctor's order, JOYNER would pay a telemedicine company to sign the doctor's order, explaining: "1st attempt will be to Doc chase. if we don't get a response. / 2nd attempt will be to call the doctor with the patient on the phone with us. if we still do not get a response. / 3rd attempt will be to transfer to [the Tesis-approved telemedicine company]."

59.    On or about May 21, 2021, JOYNER participated in "[t]raining on medical necessity" provided by Billing Company.

60.    On or about July 7, 2021, Shorr e-mailed JOYNER a new "Marketing Business Services Agreement" between Alliance and Genetic Cancer Group dated July 1, 2021, and asked JOYNER to "sign and return at your earliest convenience." The Agreement provided for payment at "an annual rate of $2,400,000," which Alliance would pay "as determined in COMPANY's sole discretion based upon lab cash flow, expenses, specimen quality, and _____, [sic] as determined by COMPANY."

61.    On or about August 2, 2021, Shorr texted Roiter, "Hi Adam did you get any word on payment? / From David Joyner. Not sure how you feel about this. If he is even due half."

62.    On or about August 3, 2021, Shorr texted Roiter, "See if you could find out anything about David Joyner payment. Either way If Ron decided not to pay anything that's fine, but if you could let me know that would be great".

63.    On or about August 5, 2021, King authorized payment of "half" of the contracted rate, or $40,000, to JOYNER.

64. On or about September 30, 2021, JOYNER texted Roiter asking if he had received his "report" yet. JOYNER told Roiter to let him know "what you got before wire so I can see if it matches." Roiter texted, "61 new 6 corrected." The same day, JOYNER e-mailed Roiter and Shorr a spreadsheet titled, "September numbers.xlsx" identifying each beneficiary for whom he had submitted a genetic testing requisition, all with the notation "ACCEPTED," plus seven "corrections." Roiter responded to JOYNER's text, "We will send a wire based on your numbers. This will catch us up through 9/29. . . . Payment on the 15th will only be made on volume that has come in from 9/30 to the cut off date in Oct. W[e] show 61 samples plus your 7 from Aug plus 7 corrections. That's the wire".

65. On or about November 1, 2021, JOYNER e-mailed Roiter and Shorr with subject line "October Numbers," and providing the following "breakdown":

> September we did 70 Plus 8 Correction total of 78 got paid for 75 So +3
> October We did 117 Plus 1 correction so 118 + 3 = 121 We already got paid for 38 on 15th so  83 Due.
>
> attached is the report I got from billing, not my accounting.

On November 1, 2021, JOYNER received a payment from Alliance for $120,350 (83x$1450).

66. On or about November 1, 2021, JOYNER texted Roiter, "Sorry, just realized we did 72 for September not 70 / SO please add 2 more for total 85." Roiter responded, "I have the wire set for 83 if I call now you will not get the wire until the 5th". Roiter responded, "No problem we can adjust later."

67. On or about November 29, 2021, JOYNER e-mailed King, Roiter, Shorr, and a Billing Company employee, stating that the majority of his "samples" were on "'hold' status" until amendments could be obtained from the ordering provider, and asked that "management

still pay me on samples that are on hold status due to the 'amendment' in good faith that I will

get these rectified as soon as possible." JOYNER's email then included a "breakdown for

November numbers":

| |
|---|
| 2 Samples Carried over from October |
| 117 in accepted Staus |
| 58 on Hold Status due to "amendment" |
| |
| 177 Total |
| - 77 Paid on 11/16/21 |
| |
| 100 Samples Payable on 11/30/21  (Please reference the attached spreadsheet for accuracy) |

On or about December 1, 2021, JOYNER received a payment from Alliance for $145,000

(100x$1450).

68.     On or about November 29, 2021, King called JOYNER to discuss the

"amendments" issue, and a portion of the call was recorded on Ronald King's phone. King told

JOYNER, "Why don't you work on that with your team and see how many you can convert

[from the original doctors' order the physician signed to a new order for the testing of different

genes].? It should be a pretty simple process. And if you get some good conversions on that then

I'll have a conversation with finance and we can make a determination to get you paid on most, if

--if not, I mean, half or more of those volumes until the rest come in. We'll figure out a number,

David. And that's my point. . . . But what I don't want is this. I don't want you and team to just

dig your heels in and say you don't want to do it."

69.     On or about November 29, 2021, JOYNER forwarded Shorr an e-mail from a

Billing Company employee, originally sent to JOYNER, King, and others, that outlined the

"amendment" process for "correcting" the doctors' orders that had the "wrong" panel checked on them.

70.    On or about December 14, 2021, Roiter texted JOYNER, "I spoke with Ron and he said he will be paying on the one on hold status." Roiter forwarded this text message to King.

71.    On or about March 3, 2022, Roiter e-mailed JOYNER a scanned copy of a letter from a physician addressed to Genetic Health Advocates that stated: "The above person is a patient of mine. After some consultation, it is apparent that SHE DOES NOT WANT AND WILL NOT MEDICALLY BENEFIT from your proposed program and testing. STOP sending me (and her) material about your Program." The letter attached the fax from Genetic Health Advocates that directed the physician to simply "Sign Page 1 and Page 3," falsely stated that a Genetic Counselor would be available with the "Assessment results," and attached a requisition form with the test panel pre-checked, diagnosis codes filled in, and a false "S.O.A.P." note that JOYNER's marketers created based on personal information collected over the phone from the beneficiary. King received a copy of the same letter on March 2, 2022.

72.    On or about April 6, 2022, JOYNER forwarded a text exchange between himself and Roiter to King. In the text exchange between JOYNER and Roiter, JOYNER asked, "Good morning, we're [sic] you able to verify 198 with Lisa?" Roiter responded, "Verified. Ron was given the number." JOYNER asked, "Do you know if wire is going out today ?" and Roiter replied, "That I do not know as I did not speak with Ron today."

73.    On or about November 7, 2022, JOYNER texted Robert O'Sullivan, "If I don't hit bigger numbers I'm not expecting payment for December."

74.     On or about December 20, 2022, JOYNER texted O'Sullivan, "We have 27 that are signed but do not have enough or any icd 10 codes / Those are easy fixes."

75.     On or about the dates listed below, each constituting a separate overt act, JOYNER solicited and received, or caused the solicitation and receipt of, the payments of the kickbacks and bribes listed below, and Ronald King caused payments to be made, in return for the referral of Medicare and commercial insurance beneficiaries for genetic testing:

|     | On or About Payment Date | Payment Amount (to Bank of America Genetic Cancer Group Account #1025) | Payment From |
|-----|--------------------------|-----------------------------------------------------------------------|--------------|
| a.  | 3/16/21   | $80,000   | BOKF Alliance Account #6226   |
| b.  | 4/1/21    | $80,000   | BOKF Alliance Account #6226   |
| c.  | 4/19/21   | $80,000   | TD Bank Alliance Account #7913 |
| d.  | 5/5/21    | $80,000   | BOKF Alliance Account #6226   |
| e.  | 5/17/21   | $80,000   | BOKF Alliance Account #6226   |
| f.  | 6/2/21    | $80,000   | BOKF Alliance Account #6226   |
| g.  | 6/17/21   | $80,000   | BOKF Alliance Account #6226   |
| h.  | 6/30/21   | $80,000   | BOKF Alliance Account #6226   |
| i.  | 7/16/21   | $40,000   | BOKF Alliance Account #6226   |
| j.  | 8/5/21    | $40,000   | BOKF Alliance Account #6226   |
| k.  | 8/17/21   | $80,000   | BOKF Alliance Account #6226   |
| l.  | 8/31/21   | $63,450   | BOKF Alliance Account #6226   |
| m.  | 9/30/21   | $105,000  | BOKF Alliance Account #6226   |
| n.  | 10/15/21  | $53,200   | BOKF Alliance Account #6226   |
| o.  | 11/1/21   | $120,350  | BOKF Alliance Account #6226   |
| p.  | 11/16/21  | $111,650  | BOKF Alliance Account #6226   |
| q.  | 12/1/21   | $145,000  | BOKF Alliance Account #6226   |
| r.  | 12/16/21  | $152,250  | BOKF Alliance Account #6226   |
| s.  | 12/30/21  | $80,000   | BOKF Alliance Account #6226   |
| t.  | 1/4/22    | $66,450   | BOKF Alliance Account #6226   |
| u.  | 1/19/22   | $71,050   | BOKF Alliance Account #6226   |
| v.  | 2/1/22    | $100,050  | BOKF Alliance Account #6226   |
| w.  | 2/16/22   | $76,850   | BOKF Alliance Account #6226   |

| x. | 3/8/22 | $110,200 | BOKF Alliance Account #6226 |
| y. | 4/6/22 | $253,000 | BOKF Alliance Account #6226 |
| z. | 4/8/22 | $34,100 | BOKF Alliance Account #6226 |
| aa. | 5/5/22 | $203,000 | BOKF Alliance Account #6226 |
| bb. | 6/6/22 | $259,000 | BOKF Alliance Account #6226 |
| cc. | 7/6/22 | $250,000 | BOKF Alliance Account #6226 |
| dd. | 9/30/22 | $250,000 | BOKF Alliance Account #6226 |
| ee. | 10/26/22 | $250,000 | BOKF Alliance Account #6226 |
| ff. | 12/1/22 | $125,000 | BOKF Alliance Account #6226 |

The foregoing is in violation of Title 18, United States Code, Section 371.

## **NOTICE OF FORFEITURE**

76.     The allegations contained in Count 1 are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

77.     Upon conviction of the violation of Title 18, United States Code, Section 371, alleged herein, the defendant, DAVID JOYNER, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all rights, title, and interest in all property constituting and derived from any proceeds obtained directly and indirectly as a result of such offense or offenses, including, but not limited to a money judgment in the amount of proceeds obtained by the conspiracy and scheme, and by the defendant.

78.     If any of the property described above, as a result of any act or omission of the defendants:

        a.    cannot be located upon the exercise of due diligence;

        b.    has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been comingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.


PETER MCNEILLY
United States Attorney

By: */s/ Anna Edgar*
Anna K. Edgar
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0405
E-mail: Anna.Edgar@usdoj.gov
Attorney for the United States

DEFENDANT:  David Joyner

AGE/YOB:  46/1979

COMPLAINT  _____ Yes ___X___ No
FILED?
    If Yes, MAGISTRATE CASE NUMBER_____

HAS DEFENDANT BEEN ARRESTED ON COMPLAINT? __ Yes _X_ No


OFFENSES:  Count 1: 18 U.S.C. § 371 (Conspiracy to violate the Anti-Kickback Statute and the Eliminating Kickbacks in Recovery Act)

LOCATION OF Adams County, Colorado, and elsewhere
OFFENSE:

PENALTY:  Count 1:  NMT 5 years of imprisonment, a fine of NMT $250,000 or twice the gross gain or loss from the offense, or both imprisonment and a fine; 3 years of supervised release; $100 special assessment; and restitution

AGENTS:  Cory Rumple, Special Agent, HHS-OIG
    Scott Sandusky, Special Agent, FBI
    Benjamin Hopping, Special Agent, IRS-CI

AUTHORIZED Anna Edgar
BY:    Assistant U.S. Attorney

ESTIMATED TIME OF TRIAL:

 _x_ five days or less; __ over five days

THE GOVERNMENT

will not seek detention in this case.

The statutory presumption of detention is not applicable to this defendant.